IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-1105-RGA |
| | : | |
| ZYDUS PHARMACEUTICALS (USA) | : | |
| INC., and CADILA HEALTHCARE | : | |
| LIMITED (d/b/a ZYDUS CADILA), | : | |
| | : | |
| Defendants. | : | |

## **CLAIM CONSTRUCTION**

---

Steven J. Balick, Esq., Wilmington, Delaware; Christopher N. Sipes, Esq. (argued) Washington, D.C.; Megan P. Keane, Esq. (argued), Washington D.C.; Attorneys for Plaintiff Warner Chilcott Company, LLC.

John C. Phillips, Jr., Esq., Wilmington, Delaware; Michael J. Gaertner, Esq. (argued), Chicago, Illinois; James T. Peterka, Esq. (argued), Chicago, Illinois; Attorneys for Defendants Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited.

---

April **22**, 2013
Wilmington, Delaware

*Anhard G. Andrews*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This is a claim construction opinion. Defendants Zydus Pharmaceuticals (USA) Inc. and

Cadila Healthcare Limited (collectively "Zydus") filed an Abbreviated New Drug Application

("ANDA") seeking approval to market a generic equivalent of Asacol® HD, an 800-mg delayed-

release mesalamine tablet. Plaintiff Warner Chilcott Company LLC sells Asacol® HD in the

United States. Warner Chilcott filed a patent infringement suit against Zydus, alleging that the

ANDA infringes Warner Chilcott's U.S. Patent No. 6,893,662 ("'662 Patent"). The '662 Patent

relates to formulations and methods of delivering mesalamine to the lower part of the

gastrointestinal tract, especially the colon. The patent teaches that the mesalamine dosage form

should be lined with an inner coating layer and an outer coating layer of enteric polymers. The

coating layers are intended to delay the release of the mesalamine until it reaches its intended

target area. They help reduce the possibility of coating fractures that may occur during

production of the dosage form, thus preventing premature dissolution of the drug in the

gastrointestinal tract.

This opinion construes the disputed claim terms for the '662 Patent.

## DISCUSSION

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d

967, 977–78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388–90 (1996). When construing the claims

of a patent, a court considers the literal language of the claim, the patent specification and the

prosecution history. *Markman*, 52 F.3d at 979. Of these sources, the specification is "always

highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best

guide to the meaning of a disputed term." *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312–

17 (Fed. Cir. 2005) (en banc) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

1

(Fed. Cir. 1996)). However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.' " *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Phillips*, 415 F.3d at 1318–19; *Markman*, 52 F.3d at 979–80. However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history. *Phillips*, 415 F.3d at 1318–19 (discussing "flaws" inherent in extrinsic evidence and noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984). If the patent inventor clearly supplies a different meaning, however, then the claim should be interpreted according to the meaning supplied by the inventor. *Markman*, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in the patent). If possible, claims should be construed to uphold validity. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

2

## 1.    "Coating layer"

The parties briefed the construction of "coating layer," but later came to agreement (D.I. 88) as to the following construction:

| Term: | "coating layer" (claims  1, 2, 5, 7, 11, 14, 16, 26, 31) |
|---|---|
| Agreed upon construction: | "A thickness of a coating material completely encasing or coating all of the solid unit dosage form or the inner coating layer." |

## 2.    "Inner coating layer" and "outer coating layer"

The parties dispute the construction of "inner coating layer" and "outer coating layer."

The proposed constructions and the construction of the Court follow:

| Term: | "inner coating layer" (claims 1, 2, 5, 7, 11, 14, 16) |
|---|---|
| Warner Chilcott's proposed construction: | Plain and ordinary meaning.  In the alternative, the "inner coating layer" is "the coating layer which is closer to the core relative to the outer coating layer." |
| Zydus' proposed construction: | "A coating layer covering the solid unit dosage form with boundaries defined by the outer surface of the solid unit dosage form and the inner boundary of the outer coating layer." |
| Construction of the Court: | Plain and ordinary meaning. |
| Term: | "outer coating layer" (claims 1, 2, 5, 7, 11, 14, 16) |
| Warner Chilcott's proposed construction: | Plain and ordinary meaning.  In the alternative, the "inner coating layer" is "the coating layer which is farther from the core relative to the inner coating layer." |
| Zydus' proposed construction: | "A distinct coating layer covering the inner coating layer with boundaries defined by the outer surface of the inner coating layer and (i) the surface of the finished dosage form or, (ii) optionally, the inner boundary of a shiny finish coat." |
| Construction of the Court: | Plain and ordinary meaning. |

The dispute of scope in regard to "inner coating layer" and "outer coating layer" is whether the two coating layers must be separated by defined boundaries. Both phrases are used as follows in claim 1: "an outer coating layer, applied to the inner coating layer, said outer coating layer comprising..." Zydus argues that the fact the "outer layer" is "applied to the inner layer" necessarily implies the existence of defined boundaries between the two layers. Warner Chilcott disagrees, arguing that there is no justification in the patent for the boundary limitation.

The Court finds no reason to read a "boundary" limitation into the claims. Neither "boundaries" nor "boundary" are words found within the '662 Patent. Further, the plain meaning of "an outer coating layer, applied to the inner coating layer" does not necessarily imply the existence of a "boundary." It is true that the "inner coating layer" must be distinguishable from the "outer coating layer," but the requirement that the layers be separated by a boundary would suggest some sort of definitive dividing line that is not envisioned anywhere within the patent. This understanding is bolstered by the possibility that the transition between layers is gradual, as could be the result of "continuous spray methods" used to apply the coating layers, or the result of applying the outer coating layer before the inner coating layer is dried or cured. *See* '662 Patent at 8:59-9:01. For these reasons, the Court rejects the "boundaries" limitation and adopts the plain and ordinary meaning of "inner coating layer" and "outer coating layer."

## 3. "An inner coating layer" and "an outer coating layer"

At oral argument (D.I. 87, p. 45), the parties agreed to the construction of "an inner coating layer" and "an outer coating layer" as follows:

| Terms: | "an inner coating layer" and "an outer coating layer" (claims 1, 2, 5, 7, 11, 14, 16) |
|---|---|

4

| Agreed upon construction for "an inner coating layer:" | "One inner coating layer, no matter how many sub-layers it is comprised of." |
| Agreed upon construction for "an outer coating layer:" | "One outer coating layer, no matter how many sub-layers it is comprised of." |

### 4. "The inner coating layer is not the same as the outer coating layer"

The next term is "the inner coating layer is not the same as the outer coating layer." The proposed constructions and the construction of the Court follow:

| Term: | "The inner coating layer is not the same as the outer coating layer" (claims 1, 11) |
| --- | --- |
| Warner Chilcott's proposed construction: | Plain and ordinary meaning.  In the alternative, "the inner coating layer is different from the outer coating layer because the coating layers comprise different materials or exhibit different characteristics or properties." |
| Zydus' proposed construction: | "The inner coating layer and the outer coating layer are not composed of the same pharmaceutically acceptable coating material." |
| Construction of the Court: | "The inner coating layer is different from the outer coating layer because the coating layers comprise different materials or the coating layers have different structural properties." |

The phrase appears in claim 1 as follows: "wherein the inner coating layer is not the same as the outer coating layer[.]" The parties agree that there must be some difference between the inner and outer coating layers. They disagree as to what may constitute this difference. Zydus argues that this difference refers to the use of distinct pharmaceutical materials in each layer. Warner Chilcott disagrees, instead arguing that it is possible for the layers to be formed from the same pharmaceutical material, so long as they have different compositional characteristics or

5

properties. Warner Chilcott argues this would be the case if the outer layer was made more plastic or spongier than the inner layer, thus giving the layers different structural properties and making them "not the same," even if formed by the same material.

There is no evidence requiring the layers to be formed from distinct material. The patentee made no statements restricting the categories of differences distinguishing the inner and outer coating layers, and certainly did not restrict those differences to types of pharmaceutical materials. The Court is convinced that the plain and ordinary meaning of "not the same" in regard to pharmaceutical coating layers includes both difference of material and difference of structure. The following quotation from the specification supports this construction:

> Generally, if the inner coating layer is [PMM 1:1] (Eudragit® L) then the outer coating layer is not [PMM 1:2] (Eudragit® S) or is not a mixture of [PMM 1:1] and [PMM 1:2]. The outer coating layer can be any coating material that protects the inner coating layer from fractures during handling and that dissolves or is removed in the gastrointestinal tract prior to the inner coating layer.

'622 Patent at 4:33-43. This description shows that the outer coating layer may be formed by "any coating material that protects the inner coating layer from fractures[.]" The fact that "any coating material" may be used to form the outer coating layer is inconsistent with strictly requiring it to be a different material from the inner coating layer.

Zydus argues that a change in process parameters is not sufficient to make two layers different, citing examples from the specification where different process parameters formed just a single layer. This supposedly undermines the argument that different process parameters invariably produce distinguishable layers. *See id.* at 9:7-12:8. It is not necessary, however, for every change in process parameters to invariably result in distinguishable layers. So long as certain variations in process parameters can form distinguishable layers using a single pharmaceutical material, the fact that the patent describes other changes in process parameters

6

that do not have this effect is inconsequential. For these reasons, the Court will not require each layer be formed of different pharmaceutical materials.

That is not to say any imaginable difference between layers is sufficient to satisfy the claims. For example, trivial differences in taste or color should not be understood to make the layers distinct, as those types of differences would not accomplish the goal of reducing coating fractures. The layers at minimum must have distinct structural properties. For this reason, the Court construes "the inner coating layer is not the same as the outer coating layer" to require the layers to either (1) be made from distinct pharmaceutical materials or (2) have distinct structural properties.

## 5. "Selected from the group consisting of"

The parties dispute the construction of "selected from the group consisting of." The proposed constructions follow, as does the construction of the Court:

| Term: | "Selected from the group consisting of" (claims 1, 8, 11, 17) |
|---|---|
| Warner Chilcott's proposed construction: | Plain and ordinary meaning. In the alternative, "identified from a number of options, those options being." |
| Zydus' proposed construction: | "An exclusionary term that allows for the inclusion of only the listed substances and excludes all others." |
| Construction of the Court: | In the context of claim 1, "the inner coating layer must be either PMM 1:2, PMM 1:1, or a mixture of the two. The presence of any other polymer is excluded. The presence of non-polymer substances such as excipients, solvents or carriers is not excluded." |

The phrase is used in claim 1 as follows: "an inner coating layer selected from the group consisting of poly(methacrylic acid, methyl methacrylate) 1:2, poly(methacrylic acid, methyl

methacrylate) 1:1, and mixtures thereof[.]" "The phrase 'consisting of' is a term of art in patent law signifying restriction and exclusion....[i]n simple terms, a drafter uses the phrase 'consisting of' to mean 'I claim what follows and nothing else.'" *Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1383 (Fed. Cir. 2000). Such language is said to create a "Markush group." *See Abbott Laboratories v. Baxter Pharm. Products, Inc.*, 334 F.3d 1274, 1281 (Fed. Cir. 2003).

Both parties acknowledge that "an inner coating layer selected from a group consisting of..." creates a "Markush group." The parties disagree, however, as to the exact claim component that the phrase restricts. Zydus argues that the Markush Group limits the entirety of the "inner coating layer" to the specifically listed polymers.[1] This would mean that the "inner coating layer" must be purely formed from the listed polymers and cannot include additional substances, such as excipients, solvents, or carriers. Warner Chilcott urges the contrary position, arguing that a person of ordinary skill in the art would interpret the Markush Group as only providing the universe of polymers within the layer, but placing no restrictions on the presence of additional substances within the layer. In support of this argument, Warner Chilcott cites portions of the specification that clearly show "inner coating layers" formed by a polymer with additional excipients, solvents, or plasticizers.[2] According to Warner Chilcott, this makes clear that the patentee never intended to exclude those substances, and nor should the scope of the Markush group.

---

[1] Although the briefing refers to claims 1, 8, 11, and 17, the dispute is focused on claim 1. The Markush groups in claims 8, 11, and 17 do not present the same dispute.
[2] *See, e.g.* '662 Patent at 6:64-67, 7:45-47, 9:21, 9:22, 9:30, 9:47-58.

8

As stated above, "selected from the group consisting of" is a term of art that denotes an exhaustive list. The patentee claims what follows and nothing else. Here, the Markush group presents a universe of polymers, which are (i) poly(methacrylic acid, methyl methacrylate) 1:2; (ii) poly(methacrylic acid, methyl methacrylate) 1:1; or (iii) mixtures of the two. There is no mention of any additional coating materials or excipients, suggesting they may not be included within the layer. "Consisting of," however, is not absolutely restrictive. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1361 (Fed. Cir. 2006). If the unrecited element is an impurity normally associated with the claimed component, it is implicitly adopted by the ordinary meaning of the compound itself and the Markush group will not exclude it. *Id.* Further, if the unrecited element is "unrelated to the invention," it will likewise not be excluded. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004).

The second exception applies here.[3] Nowhere does the patentee suggest that the excipients in question are novel or used in an inventive fashion. To the contrary, the patentee suggests that the incorporation of excipients is "well known to those skilled in the art to achieve the desired release rate, stability, absorption, and facilitate the dosage form manufacture." `662 Patent at 7:65-8:03. The presence of excipients can thus be understood to be unrelated to the actual invention. A person skilled in the art would not read the patent to exclude the basic excipients disclosed in the patent, as they are naturally associated with pharmaceutical formulations. The Federal Circuit has stated that "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiments, or that persons of skill in this field

---

[3] I think that the decision here is a very close call. I am convinced, however, that this construction most accurately describes the patentee's invention and is consistent with his description of the invention. The public notice function of the `662 Patent is not undone by this construction. A competitor is expected to read the entire patent, and the specification clearly shows the patentee envisioned excipients integrated with the pharmaceutical coating layers.

would read the specification in such a way." *Hoechst v. Celanese Corp. v. BP Chemicals Ltd.*,

78 F.3d 1575, 1580 (Fed. Cir. 1996). Construing the Markush group to exclude excipients would

exclude every preferred embodiment of the invention from the claim, as they all incorporate

excipients into both coating layers. *See id.* at 9:07-12:07 (Examples 1-5). What the Markush

group does restrict is the universe of polymers that may be used to form the layer. For these

reasons, the Court adopts, for claim 1, a construction of "selected from a group consisting of" as

"the inner coating layer must be either PMM 1:2, PMM 1:1, or a mixture of the two. The

presence of any other polymer is excluded. The presence of non-polymer substances such as

excipients, solvents or carriers is not excluded."

### 6.   "Polymethacrylates" and "anionic polymethacrylates"

The next terms are "polymethacrylates" and "anionic polymethacrylates." The proposed

constructions and the construction of the Court follow:

| Terms: | "polymethacrylates" and "anionic polymethacrylates" (claims 1, 11) |
|---|---|
| Warner Chilcott's proposed construction for "polymethacrylates:" | Plain and ordinary meaning. In the alternative, "synthetic cationic and anionic polymers of dimethylaminoethylmethacrylates, methacrylic acid and methacrylic acid esters in varying ratios. The term encompasses coating polymers labeled with the brand names Eudragit®S or Eudagrit®L." |
| Zydus' proposed construction for "polymethacrylates:" | "Polymethacrylates other than those specifically listed in claims 1 and 11." |
| Construction of the Court for polymethacrylates: | Plain and ordinary meaning |
| Warner Chilcott's proposed construction for " anionic polymethacrylates:" | Plain and ordinary meaning. In the alternative, "synthetic polymers of dimethylaminoethylmethacrylates, methacrylic acid and methacrylic acid esters in varying ratios having a negative charge. The term encompasses coating polymers labeled with |

|  | the brand names Eudragit®S or Eudragit®L or mixtures thereof." |
| Zydus' proposed construction for "anionic polymethacrylates:" | "Anionic polymethacrylates other than those specifically listed in claims 1 and 11." |
| Court's construction for "anionic polymethacrylates:" | Plain and ordinary meaning |

The parties dispute the construction of "polymethacrylates" and "anionic polymethacrylates," terms that are members of a Markush group of polymers that form the "outer coating layer." Warner Chilcott argues that the plain and ordinary meanings of these terms are appropriate. Zydus disagrees, instead arguing that all terms within a claim must be given independent and distinct meanings. Claim 1 and 11 both contain the limitation that the "outer coating layer…compris[es] an enteric polymer…selected from the group consisting of" *inter alia*,

> 1. polymethacrylates;
> 2. anionic polymethacrylates;
> 3. poly(methacrylic acid, methyl methacrylate) 1:1;
> 4. mixtures of poly(methacrylic acid, methyl methacrylate) 1:2 and poly(methacrylic acid, methyl methacrylate) 1:1; and
> 5. poly(methacrylic acid, ethyl methacrylate) 1:1.

Zydus argues that each item must have a distinct and independent meaning; they may not overlap. Accordingly, because the plain and ordinary meaning of items 1 and 2 encompass items 3-5, that construction must be incorrect. Thus, Zydus proposes that items 1-2 must be construed to have a meaning "other than those specifically listed in claims 1 and 11," i.e., items 3-5.

The Court does not agree. There is persuasive authority for the proposition that a "Markush group" may have members that overlap with one another, so long as a person skilled in the art would be reasonably apprised of the group's scope. *See Ex Parte Dale E. Hutchens &*

*Norman Cohen*, APPEAL 1996-3292, 1996 WL 1749363, *1 (Bd. Pat. App. & Interf. 1996).  It

is clear that the patentee intended to comprehensively claim "polymethacrylates" and "anionic

polymethacrylates."  The fact that the patentee listed duplicative variations of these polymers

should not affect the construction when a person skilled in the art would not have difficulty

understanding the Markush group's scope.  For this reason, the court construes these terms

according to their plain and ordinary meaning.

7.    **"Poly(methacrylic acid, methyl methacrylate) 1:2" and "poly(methacrylic acid, methyl methacrylate) 1:1"**

     The Court next construes "poly(methacrylic acid, methyl methacrylate) 1:2" and

"poly(methacrylic acid, methyl methacrylate) 1:1" ("PMM 1:2" and "PMM 1:1").  The proposed

constructions and the constructions of the Court follow:

| Terms | "poly(methacrylic acid, methyl methacrylate) 1:2" and "poly(methacrylic acid, methyl methacrylate) 1:1" (claims 1 and 11) |
|---|---|
| Warner Chilcott's proposed construction for "Poly(methacrylic acid, methyl methacrylate) 1:2" | Plain and ordinary meaning.  In the alternative, "anionic copolymer derived from methacrylic acid and methyl methacrylate, with a ratio of free carboxyl groups to the ester groups of approximately 1:2.  The term encompasses those coating materials labeled under the brand name Eudragit®S." |
| Zydus' proposed construction for "poly(methacrylic acid, methyl methacrylate) 1:2" | "An anionic copolymer derived from methacrylic acid and methyl methacrylate, with a ratio of free carboxyl groups to the ester groups of approximately 1:2, and a mean molecular weight of approximately 135,000, commonly known as Eudragit S." |
| Construction of the Court for polymethacrylates: | Plain and ordinary meaning. |
| Warner Chilcott's proposed construction for "poly(methacrylic acid, methyl methacrylate) 1:1" | Plain and ordinary meaning.  In the alternative, "anionic copolymer derived from methacrylic acid and methyl methacrylate, with a ratio of free carboxyl groups to the ester groups of approximately 1:1. The term encompasses those coating materials labeled under the brand name Eudragit®L." |
| Zydus' proposed construction for "anionic polymethacrylates:" | "An anionic copolymer derived from methacrylic acid and methyl methacrylate, with a ratio of free carboxyl groups to the |

| | ester groups of approximately 1:1, and a mean molecular weight of approximately 135,000, commonly known as Eudragit L." |
|---|---|
| Court's construction for "anionic polymethacrylates:" | Plain and ordinary meaning. |

PMM 1:2 and PMM 1:1 are examples of polymers used to form the coating layers of

claims 1 and 11. The dispute in scope is whether they are explicitly defined and thus (1) their

constructions should include a specific mean molecular weight and (2) their constructions should

include the Eudragit brand names of the drugs. Zydus argues that the specification defines both

substances as such, citing the following passage from the specification in support:

> In one embodiment the inner coating layer comprises [PMM 1:2] (Eudragit®S), or other enteric polymer material which has the same pH release characteristics in aqueous media as Eudragit®S. Eudragit®S, an anionic copolymer derived from methacrylic acid and methyl methacrylate, with a ratio of free carboxyl groups to the ester groups of approximately 1:2, and a mean molecular weight of approximately 135,000[.]

'662 Patent at 4:19-27. A patentee acts as his own lexicographer when he clearly states any

special definition of the claim terms within the specification or file history. *GlaxoSmithKline*

*LLC v. Anchen Pharmaceuticals, Inc.*, 2012 WL 5594540, *2 (D. Del. Nov. 15, 2012). The

patentee did not do so here. The claims themselves refer to the chemical names of the polymers

and do not include a particular molecular weight. Eudragit®S, not PMM 1:2, is defined

according to a molecular weight. The fact that Eudragit®S has a specific mean molecular weight

does not necessarily mean that PMM 1:2 shares that exact characteristic, even if Eudragit®S is

the brand name version of the polymer. The same rationale applies to denying the assignment of

a particular molecular weight to PMM 1:1.

13

Zydus argues that because PMM 1:2 is used interchangeably with Eudragit®S, the molecular weight limitation can be properly attributed to PMM 1:2. The specification suggests, however, that the Eudragit brands are merely used as examples of the polymer and are not intended to constitute the only claimed polymer. *See* '662 Patent at 6:20-40. Further, the specification notes that the "inner coating layer" is not limited to Eudragit®S, as the "inner coating layer" may be formed by "other enteric polymer material" so long as that material has "the same pH release characteristics" as Eudragit®S. *Id.* All of this indicates that PMM 1:2 and PMM 1:1 are not limited to the Eudragit brands. For these reasons, the Court adopts the plain and ordinary meanings of PMM 1:2 and PMM 1:1.

**8.**    **"Enteric polymer"**

The next term is "enteric polymer." The proposed constructions and the construction of the Court follow:

| Term: | "Enteric polymer" (claims 1, 11) |
|---|---|
| Warner Chilcott's proposed construction: | Plain and ordinary meaning. In the alternative, "a substance that, when used to coat a dosage form, is intended to be resistant to drug release in the stomach or ingress of gastric fluids. The term encompasses coating polymers labeled with the brand names Eudragit®S or Eudragit®L or mixtures thereof." |
| Zydus' proposed construction: | "A polymer which is insoluble in gastric juice but soluble in the less acidic environment of the small or large intestine." |
| Construction of the Court: | "A substance that, when used to coat a dosage form, is resistant to drug release in the stomach or ingress of gastric fluids." |

"Enteric polymer" is used in claim 1 as follows: "an outer coating layer, applied to the inner coating layer, said outer coating layer comprising an enteric polymer that begins to dissolve in an aqueous medium at a pH of less than about 7...." The dispute of scope chiefly

concerns whether the "enteric polymer" should be described as "insoluble in gastric fluids," as argued by Zydus, or merely "resistant to drug release in the stomach," as argued by Warner Chilcott. Zydus also argues that Warner Chilcott's construction inappropriately focuses on intentions of use rather than the claimed pharmaceutical compound itself.

The Court finds there is no requirement for the "enteric polymer" to be completely insoluble. The words "insoluble" and "insolubility" are nowhere to be found in the patent. Further, Zydus' own extrinsic evidence states that an "enteric polymer" is expected to "exhibit lower permeability to gastric fluids." (D.I. 71, Exh. 20 at 114). Lower permeability is not equivalent to the zero permeability that is implied by "insoluble." The Court rejects the proposed "insoluble" requirement and adopts the broader "resistant to drug release" limitation. The Court does agree, however, with Zydus' argument that there is no reason to construe "enteric polymer" according to subjective intentions. For all these reasons, the Court construes "enteric polymer" as "a substance that, when used to coat a dosage form, is resistant to drug release in the stomach or ingress of gastric fluids."

### 9.    "Mixtures"

The next term is "mixtures." The proposed constructions and the construction of the Court follow:

| Term: | "Mixtures" (claims 1 and 11) |
|---|---|
| Warner Chilcott's proposed construction: | Plain and ordinary meaning. In the alternative, "a system of two or more distinct chemical substances." |
| Zydus' proposed construction: | "A system of two or more distinct chemical substances wherein the components retain their individual chemical properties." |
| Construction of the Court: | "A system of two or more distinct chemical substances wherein the components retain their individual chemical properties." |

"Mixtures" is used in claim 1 as follows: "an inner coating layer selected from the group consisting of [PMM 1:2], [PMM 1:1] and mixtures thereof[.]" The parties agree that a plain and ordinary meaning is appropriate, but they disagree as to what exactly this meaning is. Warner Chilcott argues that a "mixture" is a "system of two or more distinct chemical substances," whereas Zydus argues that a "mixture" is a "system of two or more distinct chemical substances wherein the components retain their individual chemical properties." The scope in dispute is thus whether the individual chemical substances used in a mixture must retain their individual chemical properties. Both parties rely on extrinsic evidence.

Zydus cites two technical dictionaries. The first dictionary defines "mixture" as "a system of two or more distinct chemical substances...[i]n a mixture there is no redistribution of valence electrons, and the components retain their individual chemical properties." (D.I. 71, Exh. 21 at ¶58). The second defines "mixtures" as "substances that are mixed, but not chemically combined." (*Id.*). These definitions support Zydus' proposed construction. The first dictionary definition disallows the redistribution of valence electrons between the components of the mixture, which is consistent with the Zydus' limitation that the mixture must retain individual chemical properties, as a redistribution of valence electrons would result in a new chemical compound. The definition then contains the specific requirement urged by Zydus: the components of the mixture must retain their individual chemical properties. The second dictionary defines a "mixture" as "substances that are mixed, but not chemically combined." The Court views this as also consistent with Zydus' proposal. Warner Chilcott, on the other hand, offers only an expert declaration in support of its construction. (*See* D.I. 71, Exh. 22 at ¶¶ 36-38). Within the hierarchy of extrinsic evidence, technical dictionaries are more persuasive

16

than the opinions of paid experts. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317-19 (Fed. Cir. 2005). For this reason, the Court adopts Zydus' construction of "mixture."

10.   **"The outer coating layer is applied after the inner coating layer but before the inner coating layer is dried or cured"**

The next term phrase is "the outer coating layer is applied after the inner coating layer but before the inner coating layer is dried or cured." The parties' proposed construction and that of the Court follow:

| Term: | **"The outer coating layer is applied after the inner coating layer but before the inner coating layer is dried or cured" (claims 7, 16)** |
|---|---|
| Warner Chilcott's proposed construction: | Plain and ordinary meaning. In the alternative, "the outer coating layer is applied before the inner coating layer is no longer tacky, sticky, or damp or has coalesced and reached the state in which is it acceptable for storing and packaging. For example, the outer coating layer may be applied as part of a coating process continuous with the application of the inner coating layer." |
| Zydus' proposed construction: | "The outer coating layer is applied in a separate and distinct step after the inner coating layer is applied but before the inner coating layer is dried or cured; the application of the inner coating layer must end before the application of the outer coating layer can begin." |
| Construction of the Court: | "The outer coating layer is applied after the inner coating layer but before the inner coating layer is dried or cured. The application of the inner coating layer must end before the application of the outer coating layer can begin." |

This phrase is used in claim 7 as follows: "The composition of claim 6 wherein the solid dosage form is coated by continuous spray methods wherein the outer coating layer is applied after the inner coating layer but before the inner coating layer is dried or cured." The dispute concerns whether the application of the outer coating layer must be a "separate and distinct step" from the application of the inner coating layer. Zydus argues that because the claim requires the

outer coating layer to be applied "after" the inner coating layer, (1) the application of the inner coating layer must end before the application of the outer coating layer begins, and (2) the application of the outer coating layer must constitute a separate and distinct step from the application of the inner coating layer. Warner Chilcott argues that these limitations are not supported by the intrinsic evidence. Specifically, they are said to be inconsistent with claim language as a whole, which requires that "the solid dosage form is coated by continuous spray methods wherein the outer coating layer is applied after the inner coating layer." According to Warner Chilcott, the use of "continuous spray methods" is inconsistent with the "separate and distinct step" limitation.

The Court finds that the claims do require a temporal distinction between the application of the outer coating layer and the inner coating layer. Indeed, that is the only reasonable understanding of the claims' usage of the word "after." It is thus appropriate to require the application of the inner coating layer to end before the application of the outer coating layer can begin. Otherwise, the outer coating layer would not be applied "after" the inner coating layer, it would be applied concurrently with the inner coating layer. This is not inconsistent with the "continuous spray methods" limitation of the claim, as the layers may be formed by a continuous spray, so long as the outer coating layer is formed after the inner coating layer. The Court, however, does not agree that it is necessary to include the "separate and distinct step" limitation. Such a limitation may improperly imply a restriction on the processes of making the layers rather than the timing of their application.

The parties should jointly submit within five days a form of order embodying these constructions.

18